FRANK LINCOLN & others[1] *vs.* HILLSIDE PARK 'N SHOP, INC. & others.[2]

Worcester.    January 7, 1976. — May 4, 1976.

Present: REARDON, QUIRICO, BRAUCHER, KAPLAN, & WILKINS. JJ.

*Alcoholic Liquors,* License, Nuisance.  *Statute,* Construction.  *Practice, Civil,* Action to enjoin nuisance, Parties.  *Nuisance.*

With respect to a town which had voted to grant licenses for the sale of all alcoholic beverages, the proviso in the second paragraph of G. L. c. 138, § 17, that in such a town the authorities may grant at least five "additional" licenses for the sale only of wines or malt beverages "irrespective of its population," refers to licenses additional to those authorized by paragraph one of § 17, and not to licenses mentioned in the clause in the second paragraph preceding the proviso and dealing with population units. [211-214]

G. L. c. 139, § 16A, was available to "not less than ten legal voters" of a town to stop as illegal and a nuisance the sale of alcoholic beverages by defendants who owned the premises in question or possessed licenses issued by the local licensing authority and approved by the Alcoholic Beverages Control Commission over protests, although no steps had been taken to obtain review of such approval under c. 30A, § 14 [215-216]; the Superior Court had "jurisdiction" to enter a decree, although the town was not joined as a party [215-216].

A point not raised at trial in the Superior Court in a suit in equity could not be raised for the first time in this court on appeal.  [216]

BILL IN EQUITY filed in the Superior Court on September 22, 1972.

The suit was heard by *Rutledge,* J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

---

[1] Thirteen persons alleged, like the plaintiff Lincoln, to be voters of the town of Webster.

[2] N. E. C. Super Market, Inc., William A. Starzec, Thrifty Super Market, Inc., and Tiff's Package Store, Inc., which, like the defendant Hillside Park 'N Shop, Inc., had been issued licenses. Also named as defendants were the owners of the properties involved.

*Philip J. MacCarthy* for Frank Lincoln & others.

*Terence F. Riley* for New England Cash Super Market, Inc.

*Leonard E. Leboeuf* for Hillside Park 'N Shop, Inc.

KAPLAN, J. In July, 1972, the board of selectmen of the town of Webster (board), as licensing authority (see G. L. c. 138, § 1), issued a license for the sale of wines and malt beverages for off-premises consumption to each of five defendants herein (licensees). On September 5, 1972, the Alcoholic Beverages Control Commission (ABCC) approved the issuance of these licenses over the protest of certain persons who claimed to be affected. Shortly thereafter, the present suit was commenced in the Superior Court. The plaintiffs were "not less than ten legal voters" of Webster (petitioners) suing under G. L. c. 139, § 16A, to stop the sale of alcoholic beverages by some or all of the licensees as being illegal and a nuisance. They asserted that the licenses were in excess of the number authorized by law (G. L. c. 138, §§ 11, 12, 15, 17), and prayed appropriate injunctive relief.

The judge, interpreting the statutes, held after trial in findings, rulings, and order, adopted as a report of material facts, that the board had been in error: taking account of licenses previously issued, the board was authorized to issue but four of the five licenses. Accordingly, the judge by interlocutory decree ordered the five "purported licensees" to seek a decision from the board "as to which four of them are validly licensed."[3] The board found against N. E. C. Super Market, Inc. (NEC), and the judge then entered a corresponding final decree enjoining NEC and dismissing the bill as to the other four licensees. NEC appeals, asserting procedural objections to the maintenance of the suit; the petitioners appeal, claiming that two more of the licensees should have been enjoined; the four successful licensees,

---

[3] The judge found it "impossible . . . to select one licensee" from the five because of his finding that the ABCC had approved the issuance of all five licenses on the same date.

as appellees, urge an interpretation of the statutes that
would validate not only their licenses but also NEC's.

Having taken these appeals for review pursuant to G. L.
c. 211A, § 10 (A), we shall conclude that NEC's proce-
dural objections are untenable, and that the judge's ap-
proach in construing the statutes was correct, but because
of an ambiguity in the record the case must be remanded
for further proceedings.

1. Deferring discussion of the procedural points, which
will fail, we go to the merits. At all times relevant to the
action, Webster had a population of between 14,000 and
15,000. The town, by voting affirmatively on the first ballot
question of G. L. c. 138, § 11, had authorized the sale of all
alcoholic beverages.[4] By § 11, this vote legalized the "retail
sale in such ... town of all alcoholic beverages to be drunk
on and off the premises where sold, in accordance with the
provisions of this chapter." Section 12 describes on-premises
licenses and § 15 off-premises licenses.

Paragraphs one and two of § 17 contain the critical lan-
guage, set out in the margin.[5] Paragraph one says that the
local authority "may grant one license under the provisions

---

[4] The town had also voted yes on the three other ballot questions
of § 11. See n.7 below.

[5] "[1] The local licensing authorities of any city or town, except the
city of Boston, may grant one license under the provisions of section
twelve for each population unit of one thousand or additional fraction
thereof, and, in addition, one such license for each population unit of
ten thousand or fraction thereof, over the first twenty-five thousand, but
may, regardless of population, grant at least fourteen licenses under
said section twelve; and the local licensing authorities may also grant
one license under the provisions of section fifteen for each population
unit of five thousand or additional fraction thereof, but may, regardless
of population, grant at least two licenses under said section fifteen.

"[2] In addition to the number of licenses otherwise authorized to
be granted by the provisions of this section, the local licensing author-
ities of any city or town, except the city of Boston, which has voted to
grant licenses for the sale of all alcoholic beverages as provided in the
first question appearing in section eleven, may grant not more than one
license for the sale of wines or malt beverages only, or both, for each
population unit of five thousand or fraction thereof; provided, that in
any such city or town, said authorities may grant at least five additional
licenses for the sale of such beverages, irrespective of its population;
and provided, further, that the establishment of this limitation shall

of section twelve for each population unit of one thousand or additional fraction thereof . . . but may, regardless of population, grant at least fourteen licenses under . . . section twelve . . . ." By this language the permissible number of on-premises licenses, whether for all alcoholic beverages or for wines and malt beverages only,[6] would be fifteen for Webster. The same paragraph goes on to say that the local authority "may also grant one license under the provisions of section fifteen for each population unit of five thousand or additional fraction thereof, but may, regardless of population, grant at least two licenses under . . . section fifteen." Three off-premises licenses could be awarded in Webster under this wording. There is no dispute as to these interpretations.

Paragraph two of § 17 adds a complication. It says: "In addition to the number of licenses otherwise authorized to be granted by the provisions of this section," the local authority of a town which has voted to authorize the sale of all alcoholic beverages "may grant not more than one license for the sale of wines or malt beverages only, or both, for each population unit of five thousand or fraction thereof," but with the proviso that in such a town the authority "may grant at least five additional licenses for the sale of such beverages, irrespective of its population." It is to be noted that this paragraph, unlike paragraph one, does not distinguish between on- and off-premises licenses.

The question of interpretation posed by paragraph two is whether the five licenses spoken of in the proviso are cumulative to the licenses based on population units mentioned in the preceding clause, or, to the contrary, substitutional in the particular situation where the population

not be construed to prevent the renewal of any license granted prior to June fifteenth, nineteen hundred and thirty-seven."

(For purposes of referring to paragraphs of the relevant sections, we use Massachusetts General Laws Annotated [1974]. Section 17 was amended by St. 1970, c. 453, § 1, by striking out the first two paragraphs as they appeared in St. 1937, c. 424, § 3, and inserting in their place a prefatory sentence and a single paragraph, which is the present paragraph one of § 17. The previous paragraph three is now paragraph two.)

[6] This appears from the ninth paragraph of § 12.

units would themselves authorize less than five. The question became a practical one in Webster through the following actions of the board. Before the July, 1972, votes to issue licenses to the defendants, the board had issued three all alcoholic beverages licenses for off-premises consumption, thus filling the Webster quota for off-premises licenses under paragraph one of § 17. The board had also issued previously three wines and malt beverages licenses, of which one was for off-premises consumption, and two for on-premises consumption. The record does not disclose whether the latter two licenses were issued as part of the town's quota for § 12 licenses under paragraph one of § 17 or under the town's authority to issue "additional" wines and malt beverages licenses under paragraph two. Then came the issuance of the five wines and malt beverages licenses for off-premises consumption to the five defendants.

On the cumulative view (urged by the licensees who are appellees here), paragraph two authorized eight wines and malt beverages licenses which could be for on-premises or off-premises consumption; on the substitutional view, five were so authorized.

We agree with the judge below in preferring the substitutional reading. The word "additional," as used in the "provided" clause of paragraph two, refers to licenses additional to those authorized by paragraph one, and not to those mentioned in the preceding clause of paragraph two dealing with population units. "Additional" in the "provided" clause is merely repetitive of the thought conveyed by the phrase "[i]n addition" with which paragraph two begins. This allows a symmetrical and orderly reading of both paragraphs. By such a reading the three "at least" phrases are all given the same interpretation: they speak of a minimal allowance of licenses in towns like Webster which, because of their population, would not otherwise qualify for so many licenses. The presumption — that "[w]here the Legislature uses the same words in several sections which concern the same subject matter, the words 'must be presumed to have been used with the same mean-

ing in each section' " (*Insurance Rating Bd.* v. *Commissioner of Ins.*, 356 Mass. 184, 188-189 [1969], quoting from *Liddell* v. *Standard Accident Ins. Co.*, 283 Mass. 340, 346 [1933]) — is not rebutted here by the slight difficulty introduced by the use of "additional" in the proviso.

On the substitutional view, only five paragraph two wines and malt beverages licenses — not eight, as on a cumulative basis — were authorized to be issued in addition to the permissible licenses under paragraph one. But six off-premises licenses under paragraph two were in fact issued — one more than authorized, as the judge held; for after issuance of the five licenses approved by the ABCC on September 5, there were nine off-premises licenses, six more than allowed under paragraph one, and all six for wines and malt beverages. So one of those six licenses was invalid. It is possible, however, that two more of those licenses should be invalidated. This depends on whether the two on-premises wines and malt beverages licenses, as to which the record does not supply adequate information, were issued within the quota of fifteen on-premises licenses authorized by paragraph one, or must be attributed to paragraph two. Therefore the case must be remanded for further proceedings in which the necessary facts can be ascertained.[7]

---

[7] Superficially it might seem that an argument for authorization of more licenses could be based on paragraph three of § 17. This provides: "The local licensing authorities of any city or town . . . which has voted to grant licenses for the sale of wines and malt beverages, as provided in the second question appearing in section eleven, and which has also voted to grant licenses for the sale of all alcoholic beverages in packages, as provided in the third question appearing in the said section, may grant additional licenses under section fifteen [off-premises] for the sale of wines or malt beverages only, or both, equal to the number of licenses under the said section [15] otherwise authorized to be granted in any such city or town by the provisions of this section [17]." As the town of Webster had voted affirmatively on all four ballot questions (see n.4 above), the quoted language might appear applicable. But it is clear enough from § 11 that the language relates back to a case where a town has voted affirmatively on the second and third questions, and negatively on the first and fourth questions of § 11; it does not refer to a case where a town has voted affirmatively on the first question (it is immaterial how it voted on the other questions). (See, in § 11, the first and fourth paragraphs after the statement of questions.) The re-

2. (a) NEC's first procedural objection is that a ten voters' action under G. L. c. 139, § 16A, will not lie; that steps should rather have been taken to review under the State Administrative Procedure Act, G. L. c. 30A, § 14, the approval of the five licenses by the ABCC.

Section 16A, reproduced in the margin,[8] is definitely available. As we said in *Cleary* v. *Cardullo's, Inc.*, 347 Mass. 337, 351 (1964), this statute "authorize[s] bills in equity to enjoin as a nuisance the illegal sale of alcoholic beverages. Whether a license was lawfully issued may be

---

sults of this reading are orderly. A town like Webster that has voted affirmatively on the first question of § 11 gets the benefit of paragraphs one and two of § 17; a town that has voted for the narrower, more temperate alternatives of the second and third questions of § 11 gets only the benefits of paragraphs one and three of § 17. A contrary reading — that a town that has voted affirmatively on the first, second, and third questions is entitled to the benefits not only of paragraphs one and two, but also of paragraph three of § 17 — would run into the difficulty that there would be no definite number of off-premises licenses for the sale of wine and malt beverages to which the "additional licenses" of paragraph three of § 17 could be "equal," because the additional licenses authorized by paragraph two of § 17 may be either on-premises or off-premises as determined by the licensing authorities.

Put in another way, the term "additional" has the same meaning in paragraph three as it has in paragraph two of § 17: "additional" to the licenses authorized under paragraph one of § 17.

[8] General Laws c. 139, § 16A, provides in relevant part: "Upon a civil action brought in the name of the commonwealth by the attorney general, or district attorney for the district, or the chief of police, or the board or officer having control of the police of the state, or of a town or city, or by not less than ten legal voters of a town or city, in their own names, stating that a building, place or tenement situated therein is being used for the illegal keeping, sale or manufacture of alcoholic beverages, as defined in section one of chapter one hundred and thirty-eight, the superior court may abate the same as a common nuisance and may enjoin the person conducting or maintaining the same, and the owner, lessee or agent of the building, place or tenement in or upon which said nuisance exists, and their grantees or assignees, from directly or indirectly maintaining or permitting such nuisance, and, subject to the provisions hereinafter contained, may order the effectual closing of such building, place or tenement, and the prohibition of its use for any purpose for one year thereafter. Proceedings under this section shall be in the manner provided in sections seven to twelve, inclusive, except that the provisions of section nine regulating the closing of a building, place or tenement and the prohibition of its use for any purpose for one year because of the maintenance of such a nuisance shall not apply."

tested in that manner." And regarding the proper approach to the statute: "the remedy given to public officials and to taxpayers . . . is to be construed broadly." Any voters of the town may qualify as plaintiffs under § 16A, whereas a person must be "substantially affected"[9] to oppose the issuance of a license by the ABCC; and the interest vindicated in the § 16A action is different from that at stake before the ABCC. Thus the procedures run on different tracks. Further, the objection taken by NEC, such as it is, is analogous to a defense of res judicata, which must be affirmatively alleged by answer if it is to be relied on. *Fabrizio* v. *U.S. Susuki Motor Corp.*, 362 Mass. 873, 873-874 (1972). *Hacker* v. *Beck*, 325 Mass. 594, 598 (1950). That was not done. Nor are we made aware of what coincidence there may have been between the persons who protested before the ABCC and the petitioners here, or what if any relationship existed between the two groups. *Lyon* v. *Parkinson*, 340 Mass. 567, 568-569 (1960). *Hopkins* v. *Holcombe*, 308 Mass. 54, 57 (1941). More simply, NEC did not in any fashion raise below the point that the ABCC proceeding was preclusive of the present action, and it is not permitted to raise it for the first time on appeal here. *Milton* v. *Civil Serv. Comm'n*, 365 Mass. 368, 379 (1974). *Henchey* v. *Cox*, 348 Mass. 742, 747 (1965). In this view we need hardly add that it remains a question whether review under G. L. c. 30A, § 14, of the ABCC's action was at all available. See *Connolly* v. *Alcoholic Beverages Control Comm'n*, 334 Mass. 613, 618 n.1 (1956). (Indeed, the record indicates that the ABCC thought the protestors were not persons "substantially affected" so as to have standing before it.)[10]

---

[9] The expression is quoted from § 57.34 of the Rules and Regulations of the Alcoholic Beverages Control Commission. A hearing on the protest is within the discretion of the ABCC.

[10] Quite groundless is NEC's argument that it was entitled to a hearing before its license was "revoked," citing G. L. c. 30A, § 13 (license revocations by agencies); G. L. c. 138, § 64 (suspension, modification, or revocation of liquor licenses by the local licensing authorities or the ABCC). There was no "revocation" here by any agency within either statute, but rather a judgment of a court.

(b)  NEC argues, next, that the Superior Court lacked "jurisdiction" to enter a decree because the town (represented by the board as licensing authority) was an indispensable party to the action and was not joined.[11] But G. L. c. 139, § 16A, defines the parties to the lawsuit. The owners of the premises in question must be joined as defendants, in addition to the licensees, as was done here. See *Vaughan* v. *Max's Mkt. Inc.*, 343 Mass. 394, 395-396 (1961); G. L. c. 139, § 7. There is no reference in the statute to the town or the board as a party, and § 16A actions have gone forward in the past where neither the city or town nor its licensing authority has been joined. See, e.g., *Jasper* v. *Michael A. Dolan, Inc.*, 355 Mass. 17 (1968); *Cleary* v. *Cardullo's Inc., supra.*

The decrees are reversed and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

[11] The present suit was tried before the effective date of the new Rules of Civil Procedure. Absence of an "indispensable" party was sometimes spoken of as "jurisdictional." Cf. *Attorney Gen.* v. *Department of Pub. Util.*, 342 Mass. 662, 667 (1961). As to whether failure to join a person "needed for just adjudication" (Mass. R. Civ. P. 19, 365 Mass. 765 [1974]) is any longer in such a category, so that it could be availed of for the first time on the appellate level, see 7 C.A. Wright & A. R. Miller, Federal Practice and Procedure §§ 1609, 1611 (1972).